RECEIVED
USDC CLERK, CHARLESTON, SC

2005 JUL 12  A 11: 28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Cynthia D. Fabian, | C. A. No. 2:03-3590-DCN-RSC |
| Plaintiff, | |
| -versus- | **REPORT AND RECOMMENDAITON** |
| Medical University of South Carolina and Medical University Hospital Authority (MUHA),[1] | |
| Defendants. | |

This employment case alleging violations of the American with Disabilities Act (ADA), 42 U.S.C. § 12101 et. seq., and S.C. Human Resources law is before the undersigned United States Magistrate Judge for a report and recommendation on the defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure filed on October 12, 2004. 28 U.S.C. § 636(b).

On October 16, 2003, the plaintiff, Cynthia D. Fabian, brought claims in state court alleging the defendant, Medical University Hospital Authority (MUHA), failed to provide her a reasonable accommodation under the ADA and retaliated against her for asking for a reasonable accommodation, both in violation of the ADA and S.C. Human Resources law. The defendant removed the action to this court, and following the close of discovery, moved

---

[1] Medical University of South Carolina was a named defendant as well but has been dismissed.

1

for summary judgement. MUHA argues that Fabian's state causes of action are barred by the applicable statute of limitations, that it engaged in an interactive process with Fabian and more than tried to provide a reasonable accommodation for the plaintiff, but that Fabian failed to keep an appointment for a position she could perform, and that she has not rebutted its legitimate nondiscriminatory reason for her termination.

Discovery is complete and oral argument on the motion was had before the undersigned on April 13, 2005. Hence it appears consideration of the motion is appropriate.

## SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court first must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. Celotex Corp. v. Cattrett, 477 U.S. 317 (1986). All evidence should be viewed in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-23 (4th Cir. 1990). Once a

motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. CenTra, Inc., 947 F.2d 115, 119 (4th Cir. 1991); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Unsupported speculation is not enough to withstand a motion for summary judgment. Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-12 (4th Cir. 1986).

## FACTS

The undisputed facts of the case, as taken from the parties Joint Submission of Facts filed on February 1, 2005, are as follows:

> "Plaintiff obtained her Associates degree in nursing from Trident Technical College in 1996. She accepted her first nursing job with Defendant in January of 1997, and was assigned to the Hospital's Labor and Delivery (L&D) unit. When she began her employment, a more seasoned RN on the unit, Karen Stephenson, acted as her preceptor or mentor and taught her how to perform her job duties. Thereafter, Ms. Stephenson was Plaintiff's immediate supervisor at all times during her Hospital employment. In addition to Ms. Stephenson, Plaintiff's chain of command included Debra Branson-Jones, her nurse manager, and Karen Weaver, her Director. As her immediate supervisor, Ms. Stephenson was required to complete Plaintiff's performance evaluations and submit them for review and approval of Mses.

3

Branson-Jones and Weaver. Plaintiff received five formal evaluations during her employment with the Hospital. The last was for an evaluation period ending just prior to the time of her injury, but was completed, reviewed, and given to Plaintiff shortly after her injury. All were prepared by Ms. Stephenson and approved after review by Mses. Branson-Jones and Weaver. On some evaluations, Plaintiff made a written notation that she agreed with the evaluations and thought them to be fair and, at her deposition, Plaintiff confirmed that she believed all of the evaluations were a fair assessment of her performance at the Hospital. The evaluations generally contained relatively high numeric ratings and positive comments which indicated that Plaintiff was well-liked and well-respected by Stephenson, Branson-Jones, Weaver, and her various coworkers.

On or about September 18, 2001, Plaintiff suffered a ruptured aneurism in the right side of her brain which was followed by a stroke. She remained hospitalized for approximately two months. She was treated by neurosurgeon, George Khoury. Dr. Khoury testified that her initial trauma was life threatening. He later elaborated that fewer than fifty percent of individuals who suffer that type and level of trauma survive. During Plaintiff's stay in the hospital, it was discovered that she also had three additional unruptured aneurisms in her brain-two on the left and one on the right. Those were corrected surgically on January 4, 2002, (left) and March 2, 2002, (right). The latter surgeries were delayed and staggered left to right so that Plaintiff's brain would have an opportunity for recovery prior to the further trauma of additional surgeries.

After her injury, Plaintiff was left with lasting physical deficits. According to an evaluation performed at the direction of Dr. Khoury, Plaintiff also suffered resulting cognitive deficits.

Because of her length of service, Plaintiff was entitled to receive up to twelve weeks of leave under the Family and Medical Leave Act (FMLA). That leave was granted and was exhausted

4

in December of 2001. However, Plaintiff's coworkers and supervisors asked the Hospital to consider accommodating her further by giving her additional administrative leave (with pay), in part, so that she would have a sufficient length of service in order to qualify for disability retirement under the State plan should she need that. The Hospital agreed to make that accommodation for Plaintiff. The Hospital continued to hold Plaintiff's position for her into the month of January which resulted in her becoming eligible for a second twelve weeks of FMLA leave (the Hospital's policy allows twelve weeks per calendar year). Ultimately, that leave neared its end without Plaintiff's having been returned to work, and the Hospital notified Plaintiff that, on or about March 27, 2002, it would end her employment. In response to that notification, Dr. Khoury released Plaintiff to return to work on March 26, 2002. Dr. Khoury's release limited Plaintiff to working a modified schedule and stated that she would be re-evaluated after another thirty days.

Upon returning to work, Plaintiff had difficulty performing certain tasks. She asked for accommodations in certain areas, including requesting help tying her mask, tying tourniquets, and starting IVs. Her coworkers testified that they observed other difficulties as well. The parties agree that the Hospital made the following accommodations: (1) Plaintiff was given a reduced schedule; and (2) she was initially placed in the triage/exam area where the pace is slower and the acuity level lower (Plaintiff testified that she was the only nurse assigned to work in the exam room, but that "there is always somebody, an RN, at the desk, which is at the exam room, and you stick your head out the door, 'Can you come here for a minute?'"). The parties also agree that, at some point, Plaintiff was provided a reorientation to her duties, although Plaintiff asserts as set forth in Section I that it was not sufficient. Defendant contends that Plaintiff also was put in a "shadowing" posture such that she was at all times accompanied by a seasoned nurse, but Plaintiff disputes that as discussed in Sections II and III below.

5

Plaintiff admits that she could not have performed the job of an RN in the L&D unit after her return, and that she continues to be unable to do so. Similarly, Dr. Khoury, and Plaintiff's vocational expert, Jean Hutchenson, also testified that Plaintiff cannot perform as an RN in L&D, though both opine that there are other types of nursing jobs she would be able to do.

As it became evident that Plaintiff was struggling with her job duties, Ms. Jones went to the Hospital's Human Resources representative, Eric Frisch, and expressed concerns regarding Ms. Fabian. The Hospital requested that Dr. Khoury refer her for testing to determine her ability to perform job functions. Dr. Khoury believed this was a reasonable approach, and he referred Plaintiff for an Occupational Therapy Evaluation which was performed on June 6, 2002, and for a Functional Capacity Exam which was performed on June 7, 2002. The results of those evaluations confirmed that Plaintiff had physical and cognitive deficits[2], and Dr. Khoury, in an effort to help Plaintiff cope with her disabilities, sent

---

[2] Plaintiff believes it is pertinent that, in her June 7, 2002, letter to Dr. Khoury reporting the FCE testing results, the physical therapist, Ellen Berge, confirmed that the "FCE testing results do not appear to qualify Ms. Fabian for her job as a Registered Nurse as listed in the Dictionary of Occupational Titles ....However, FCE results do appear to qualify Ms. Fabian for her job as Clinical Nurse II, according to the employer's job description." Defendant agrees that that language is in the letter, but does not believe it relevant because the "job description" upon which Ms. Berge relied in making that statement was, according to the testimony of hospital witnesses, not Ms. Fabian's job description. Moreover, in her deposition, Ms. Berge was provided the job description that hospital records show to be Plaintiff's job description and, upon review, she confirmed that her test results indicated that Ms. Fabian could not perform the duties described in that job description. Finally, the "job description" upon which Ms. Berge relied in her letter was enclosed with the letter such that it was evident at the time what she had be using.

6

her to occupational therapy with Erica Barrow.[3] After reviewing those results the Hospital concluded that Plaintiff could not perform the essential functions of her L&D position, with or without accommodation. However, Plaintiff was given a thirty-day period in which to find an alternate Hospital position she might be able to perform. Specifically, Plaintiff was advised in correspondence dated June 12, 2002, to meet with a nurse recruiter for assistance in finding an alternate position.

Plaintiff applied for four MUHA[4] jobs:

1. Position #9319000 - Clinical Nurse Coordinator in the psychiatric unit;
2. Position # 012686 - Registered Nurse I in Oral and Maxiofacial Surgery;
3. Position # A022846 - Program Manager I in Marketing Communications; and
4. Position # A022187 - Administrative Assistant in the Marketing Referral Call Center. The parties agree that Plaintiff was not qualified for the Psychiatric Unit position (#9319000), nor was she qualified for the surgical position (#0126686) or the Program Manager position (# A022846). The only MUHA position which was available during the subject period, for which Plaintiff applied and for which she met the minimum qualifications was the Call Center position (A022187).

In addition to applying for the MUHA positions outlined above, Ms. Fabian claims that

---

[3] Plaintiff asserts that Barrow's treatment notes indicate that she made some improvement after participating in therapy. Defendant does not dispute that Barrow's notes indicate improvement. However, Defendant contends that this fact is not relevant to the case because of the dates of improvement and because there is no allegation or evidence that Defendant was made aware of the treatment or alleged improvement at any time.

[4] One of these MUHA positions —012686— was actually an MUSC position. However, for the purposes of this litigation, the parties have stipulated that the MUSC position shall be treated as an MUHA position. MUSC was initially a named defendant, and was subsequently dismissed by consent of the parties.

7

she applied for two additional positions which she says she believed were MUHA positions:

1. UMA Position in dermatology surgery
2. Position in the McClennan Banks Center.

The parties agree that Plaintiff was not qualified to perform the surgical position. This leaves, of the two, only the McClennan Banks Center position.

As to the McClennen Banks position, the only information contained in the record is that it was a McClennan Banks position and that Plaintiff claims to have applied for the position.

As to the Call Center position, the parties agree to the following facts: The Call Center job was one for which Plaintiff appeared to have the minimum requirements. It involved manning a telephone station to receive calls from individuals in search of various types of health care, then, depending upon the individual's need, referring that person's call to the appropriate division of the Hospital for further assistance. There were approximately 50 applicants. The individual in charge of recruiting was Mr. Steve Paterniti. Because the job requires telephone skills, Mr. Paterniti initially contacted the applicants by telephone to get a sense of their phone skills. During her telephone contact, Plaintiff did well, and Paterniti invited her in for a personal interview. The parties agree that Plaintiff came in for an interview on August 8, 2002. Beyond that they part company as is set forth in Sections II and III. However, the parties also agree that Mr. Paterniti created four records relating to the recruitment process: (1) notations on his individual desk calendar of dates and times of interviews; (2) an Applicant Review List which he completed during the recruitment process; (3) a brief summary the Business Manager, as a matter of routine policy, required Paterniti to prepare relating to the candidates and who was selected and why; and (4) a letter to Plaintiff dated August 16, 2002. In addition to the documents created by Mr. Paterniti, the record includes a document with handwritten notes made by Eric Frisch (from the Hospital's human resources

8

office) relating to the interviews with Plaintiff. Frisch and Paterniti both testified that the handwritten notes were made by Frisch during a telephone conversation with Paterniti about Plaintiff's application. Mr. Frisch testified that he believed the handwritten notes to have been made on or about January 8, 2003-the date that the computer printout on which they were written was printed. Mr. Paterniti testified that, at the time of the conversation, he was reading from his desk calendar to provide Mr. Frisch with the information handwritten by Frisch. Mr. Paterniti also testified that he later discarded the calendar. Ultimately, a candidate other than Plaintiff was offered and accepted the Call Center position. Plaintiff did not find another job, and the Hospital ended Plaintiff's employment at the end of the thirty-day period on July 14, 2002."

## ADA LAW

Plaintiff brought causes of action against defendant MUHA based on the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et. seq., which took effect on July 26, 1992. That Act provides in pertinent part: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The purpose of the ADA is simply to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.

The ADA prohibits an employer from discriminating against an "individual with a disability" who, with "reasonable accommodation," can perform the essential functions of the job. § 12112(a) and (b). The ADA declares that "discrimination" includes an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified ... employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." § 12112(b)(5)(A). Of special importance here, the ADA indicates that the term "'reasonable accommodation' may include ... reassignment to a vacant position." § 12111(9)(B).

To prevail on a failure to accommodate claim absent direct evidence, the plaintiff employee may establish a *prima facie* case of failure to accommodate. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985), overruled on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). To establish a *prima facie* case of failure to accommodate under the ADA, a plaintiff must present facts tending to show that: (1) she was an individual with a disability within the meaning of the ADA; (2) the employer had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of the position; and (4) the employer refused to make such accommodations. Rhoads v.

10

FDIC, 257 F.3d 373, 387 n. 11 (4th Cir. 2001). Implicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation. 29 C.F.R. § 1630.2(o)(3).

As to a claim of retaliation, § 503(a) of the ADA prohibits retaliation by an employer against an employee who enforces his rights under the ADA. See, 42 U.S.C.A. § 12203(a). Under 42 U.S.C. § 12203, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

To prevail on a retaliation claim, the employee in the absence of direct evidence may establish a *prima facie* case of retaliation. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985), overruled on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In order to establish a *prima facie* case of retaliation, a plaintiff must show (1) that she has engaged in conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action. Rhoads v. FDIC, 257 F.3d 373, 392 (4th Cir. 2001). A temporal connection between the protected conduct and

11

the adverse employment action may be sufficient to present a genuine factual issue on retaliation. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). Indeed, "[a] close temporal connection between the two events 'is generally enough to satisfy the third element of the *prima facie* test." McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796-97 (7th Cir. 1997), quoted with approval in Lamb v. Qualex, Inc., 33 Fed.Appx. 49, 2002 WL 500492 (4th Cir. 2002).

If the plaintiff establishes a *prima facie* case, then the defendant must articulate a legitimate non-retaliatory reason for its action to survive summary judgment. Id. Should the employer do so, then the plaintiff must present evidence that the employer's articulated reason is pretextual and that the real reason for the employer's action was to retaliate against her for having taken the protected action thus creating a genuine issue for trial.

## DISCUSSION

The plaintiff believes the defendant did not enter into an interactive attempt to provide the plaintiff with a reasonable accommodation and instead fired her in retaliation for the protected conduct of asking for a reasonable accommodation. MUHA contends it engaged in an interactive process with Fabian and more than tried to provide a reasonable accommodation for Fabian, but that Fabian failed to keep an appointment for a position she

12

could perform. MUHA asserts it did not retaliate against her for asking for a reasonable accommodation, but rather Fabian herself caused the reasonable accommodation to fail because she did not keep an appointment for a job interview.

In the instant case, there appears to be evidence in the record and inferences therefrom which, when considered in the light most favorable to the plaintiff as the nonmoving party, creates a disputed issue of material fact as to whether both parties met their respective burdens of engaging in the interactive process in good faith, and whether that caused a failure to accommodate.

First, there is evidence that Fabian was not provided with an actual reorientation into the L&D unit. According to Fabian, prior to the reorientation, she was required to work in an exam room without any other nurses. She was not provided the reorientation until May 15th or 16th, two months after she returned to work. Two nurses were presented by Defendant as nurses who had "shadowed" Fabian extensively during a reorientation. One of those nurses, Althea Cooper-Smith, testified that she had only worked with Fabian on one patient for one shift. The other nurse, Karen Stephenson, indicated she had spent extensive time with Fabian. However, a review of the call off sheet indicates Stephenson could not have spent extensive time with Fabian because Fabian was working only two shifts a

13

week on her reduced schedule, and she was being called out on average one of those days every week.

Similarly, Fabian told her supervisor, Debra Jones, that she wanted to work. Jones did not explain Fabian's ADA entitlements to her. Jones went to the human resources representative, Eric Frisch, and expressed her concerns regarding Fabian's disabilities. Fabian stated that Frisch did not discuss the ADA with Fabian, but Frisch stated that he did discuss her abilities and potential for finding another position within the hospital that she and her physician agreed she could perform.

Additionally, the plaintiff deposed that she communicated her desire and her ability to perform a telephone call job. This reasonable accommodation did exist and another person was offered the job. The plaintiff has evidence that she was not called back for a final interview and the defendant has evidence that the plaintiff simply failed to appear for the interview, which resulted in the other candidate's selection. In light of this polar evidence of the reasons concerning accommodations for the plaintiff, a fact finder must determine whether there was a failure to provide the plaintiff a reasonable accommodation.

Likewise, the retaliation claim should survive summary judgment. The plaintiff established a *prima facie* case and the defendant articulated a legitimate nondiscriminatory reason for ending her employment. Whether the plaintiff has demonstrated

14

that the defendant's proffered reason is merely pretextual again hinges on which version of the parties' stories are credited by a finder of fact. Under Rule 56 and <u>Celotex</u> summary judgment should be denied.

Lastly, defendant asserts in its motion for summary judgment that plaintiff's state law claims under the South Carolina Human Affairs law are barred by the applicable state limitations period. It appears the defendant is correct.

A charging party who wishes to file a lawsuit based on the state law must do so within one hundred twenty (120) days following the state agency's merit determination, and must also do so on or before the date one year after the date specified in her charge as being the most recent date of the allegedly discriminatory action. S.C. Ann. § 1-13-90(d)(6). The plaintiff's letter of dismissal and notice of right-to-sue was issued by the agency on June 30, 2003. Plaintiff's original charge of discrimination identifies July 14, 2002, the date her discharge became final, as the date of the latest action which she alleged in her charge to be discriminatory. Thus, in order to bring a state law discrimination claim, plaintiff was required to file suit not later than the earlier of one hundred and twenty (120) days after June 30, 2003, or one year after July 13, 2002. The one hundred and twenty day (120) period from June 30, 2003, ended on October 28, 2003, and the one-year period from July 13,

15

2002, ended on July 14, 2003. Thus, plaintiff's time in which to file an action based on the state law ran on the earlier of those two dates, July 14, 2003. However, plaintiff did not file her suit until October 16, 2003, outside the limitations period. See, Cromer v. Greenwood Comm'n of Pub. Works, 1993 WL 328182 (S.C. Com. Pl.)(Plaintiff's state law claim under Human Affairs law dismissed because it was not commenced within one year of the violation alleged in plaintiff's sworn charge of discrimination filed with the Human Affairs Commission.). Plaintiff's state law claims are time barred here as a result.

## CONCLUSION

Accordingly, for the aforementioned reasons, it is recommended that the defendant's motion for summary judgment be granted as to the state law claims and denied as to the ADA claims.

Respectfully Submitted,

Robert S. Carr
United States Magistrate Judge

Charleston, South Carolina
July 11, 2005