IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Cynthia D. Fabian, | ) | C/A No. 2:03-3590-18 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| Medical University Hospital Authority, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.  Background

On October 16, 2003, plaintiff Cynthia D. Fabian ("plaintiff" or "Fabian") filed a complaint in the Charleston County Court of Common Pleas (the "Complaint"), alleging employment discrimination and retaliation under South Carolina law (S.C. Code Ann. §§ 43-33-510- 43-33-580) and federal law (the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213) against defendant Medical University Hospital Authority ("defendant", "MUHA", or the "Hospital").[1]  On November 13, 2003, defendant removed the action to this court under 28 U.S.C. § 1441 based on jurisdiction conferred by § 1331 of that same Title.

On October 12, 2004, defendant moved for summary judgment.  On October 27, 2004, plaintiff responded, and on November 4, 2004, defendant replied.  Pursuant to an order from United States Magistrate Judge George C. Kosko, the parties submitted a joint stipulation of facts, and then, on April 11 and 13, respectively, defendant and plaintiff

---

[1] Plaintiff originally brought suit against Medical University of South Carolina ("MUSC") as well, but on September 27, 2004, the parties consented to MUSC's dismissal with prejudice, leaving MUHA as the only defendant.

submitted supplemental briefing regarding the summary judgment motion.[2]  After an

April 13 hearing, on July 12, 2005, United States Magistrate Judge Robert S. Carr issued

a Report and Recommendation (the "Report") as to the merits of defendant's motion for

summary judgment, recommending that it be granted with respect to the state law claims

and denied with respect to the federal law claims.  On July 26, 2005, defendant objected,

and on August 1, 2005, plaintiff replied.  The court heard argument on August 2, 2005

and now issues its ruling.

## II.  Standard of review

This court is charged with conducting a de novo review of any portion of the

magistrate judge's Report and Recommendation to which a specific objection is registered

and may accept, reject, or modify, in whole or in part, the recommendation contained in

that Report.  28 U.S.C. § 636(b)(1).  A party's failure to object is accepted as agreement

with the conclusions of the magistrate judge.  Thomas v. Arn, 474 U.S. 140 (1985).  This

court is not required to review under a de novo standard, or any other standard, the factual

findings and legal conclusions of the magistrate judge to which the parties have not

objected.  Id. at 149-50.  General objections will not suffice to obtain judicial review of a

magistrate judge's findings.  Howard v. Sec'y of Health & Human Servs., 932 F.2d 505,

508-09 (6th Cir. 1991).

Additionally, summary judgment is proper only when there is no genuine issue of

material fact.  Fed. R. Civ. P. 56(c).  The moving party has the burden of showing the

---

[2] It appears as though plaintiff passed up her Supplemental Brief to the magistrate
judge at the April 13 hearing and that, due to some administrative confusion, it was not
docketed until July 26, 2005.

absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. Barwick v. Celotex Corp., 736 F.2d 946, 958 (4th Cir. 1984). Material facts are those that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is only genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. Consequently, in evaluating a motion for summary judgment, the court views the record in the light most favorable to the nonmoving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-124 (4th Cir. 1990).

### III.  Facts

As alluded to, the parties have stipulated to certain facts they both deem relevant and have attempted to parse the ones whose existence– or at least whose relevancy to summary judgment– is contested.[3]

#### A.     Undisputed facts[4]

Plaintiff obtained her Associates degree in nursing from Trident Technical College in 1996. She accepted her first nursing job with defendant in January of 1997, and was assigned to the Hospital's Labor and Delivery (L&D) unit. When plaintiff began her employment, a more seasoned registered nurse ("RN") on the unit, Karen Stephenson ("Stephenson"), acted as her preceptor or mentor and taught her how to perform her job

---

[3] In addition to these facts, the parties mostly agree to the circumstances surrounding plaintiff's two applications for Social Security Disability Insurance Benefits discussed later in this order. As those facts concern a narrow issue, they are only addressed in the pertinent section.

[4] The facts recounted in this section are according to the parties' Joint Submission of Facts and are not disputed unless noted as such.

3

duties.  Thereafter, Stephenson was plaintiff's immediate supervisor at all times during her Hospital employment.  In addition to Stephenson, plaintiff's chain of command included Debra Branson-Jones ("Branson-Jones"), her nurse manager, and Karen Weaver ("Weaver"), her Director.   As her immediate supervisor, Stephenson was required to complete plaintiff's performance evaluations and submit them for review and approval of Branson-Jones and Weaver.  Plaintiff received five formal evaluations during her employment with the Hospital.  The last was for an evaluation period ending just prior to the time of her injury, but was completed, reviewed, and given to plaintiff shortly after her injury.  All were prepared by Stephenson and approved after review by Branson-Jones and Weaver.  On some evaluations, plaintiff made a written notation that she agreed with the evaluations and thought them to be fair and, at her deposition, plaintiff confirmed that she believed *all* of the evaluations were a fair assessment of her performance at the Hospital.  The evaluations generally contained relatively high numeric ratings and positive comments, indicating that plaintiff was well-liked and well-respected by Stephenson, Branson-Jones, Weaver, and her various coworkers.

On or about September 18, 2001, plaintiff suffered a ruptured aneurysm in the right side of her brain that was followed by a stroke.  She remained hospitalized for approximately two months.  Dr. George Khoury, a neurosurgeon, treated plaintiff and testified that her initial trauma was life threatening.  He later elaborated that fewer than fifty percent of individuals who suffer that type and level of trauma survive.  During plaintiff's stay in the hospital, it was discovered that she also had three additional *un*ruptured aneurysms in her brain– two on the left and one on the right.  The aneurysms

4

were corrected surgically on January 4, 2002 (left) and March 2, 2002 (right).  The latter surgeries were delayed and staggered left to right so that plaintiff's brain would have an opportunity for recovery prior to the further trauma of additional surgeries.

The ruptured aneurysms and surgeries left plaintiff with lasting physical deficits. According to an evaluation performed at the direction of Dr. Khoury, plaintiff also suffered resulting cognitive deficits.

Because of her length of service, plaintiff was entitled to receive up to twelve weeks of leave under the Family and Medical Leave Act (FMLA).  That leave was granted and was exhausted in December of 2001.  Plaintiff's coworkers and supervisors asked the Hospital to consider accommodating her further by giving her additional administrative leave (with pay), in part, so that she would have a sufficient length of service in order to qualify for disability retirement under the State plan should she need that.  The Hospital agreed to make that accommodation for plaintiff.  The Hospital continued to hold plaintiff's position for her into the month of January, which resulted in her becoming eligible for a second twelve weeks of FMLA leave (the Hospital's policy allows twelve weeks per calendar year).  Ultimately, that leave neared its end without plaintiff's having returned to work, and the Hospital notified plaintiff that, on or about March 27, 2002, it would end her employment.  In response to that notification, Dr. Khoury released plaintiff to return to work on March 26, 2002.  Dr. Khoury's release limited plaintiff to working a modified schedule and stated that she would be re-evaluated after thirty days.

Upon returning to work, plaintiff had difficulty performing certain tasks.  She

asked for accommodations in certain areas, including help tying her mask, tying tourniquets, and starting IVs. Her coworkers testified that they observed other difficulties as well. The parties agree that the Hospital made the following accommodations: (1) plaintiff was given a reduced schedule; and (2) she was initially placed in the triage/exam area where the pace is slower and the acuity level lower (plaintiff testified that she was the only nurse assigned to work in the exam room, but that "there is always somebody, an RN, at the desk, which is at the exam room, and you stick your head out the door, 'Can you come here for a minute?'"). The parties also agree that, at some point, plaintiff was provided a reorientation to her duties, although plaintiff asserts that it was not sufficient. Defendant contends that it also put plaintiff in a "shadowing" posture such that she was at all times accompanied by a seasoned nurse, but plaintiff disputes that as discussed below.

Plaintiff admits that she could not have performed the job of an RN in the L&D unit after her return and that she continues to be unable to do so. Similarly, Dr. Khoury, and plaintiff's vocational expert, Jean Hutchinson ("Hutchinson"), also testified that plaintiff cannot perform as an RN in L&D, though both opine that there are other types of nursing jobs she would be able to do.

As it became evident that plaintiff was struggling with her job duties, Branson-Jones went to the Hospital's Human Resources representative, Eric Frisch ("Frisch"), and expressed concerns regarding plaintiff. The Hospital requested that Dr. Khoury refer her for testing to determine her ability to perform job functions. Dr. Khoury believed this was a reasonable approach, and he referred plaintiff for an Occupational Therapy

6

Evaluation, which was performed on June 6, 2002, and for a Functional Capacity Exam, which was performed on June 7, 2002.  The results of those evaluations confirmed that plaintiff had physical and cognitive deficits,[5] and Dr. Khoury, in an effort to help plaintiff cope with her disabilities, sent her to occupational therapy with Erica Barrow ("Barrow").[6]  After reviewing those results, the Hospital concluded that plaintiff could not perform the essential functions of her L&D position, with or without accommodation, and plaintiff was given a thirty-day period in which to find an alternate Hospital position she might be able to perform.  Specifically, plaintiff was advised in correspondence dated June 12, 2002, to meet with a nurse recruiter for assistance in finding an alternate position.

_____

[5] Plaintiff believes it is pertinent that, in her June 7, 2002 letter to Dr. Khoury reporting the FCE testing results, the physical therapist, Ellen Berge ("Berge"), confirmed that the "FCE testing results do not appear to qualify Ms. Fabian for her job as a Registered Nurse as listed in the Dictionary of Occupational Titles . . . . However, FCE results do appear to qualify Ms. Fabian for her job as Clinical Nurse II, according to the employer's job description."  Defendant agrees that language is in the letter, but does not believe it relevant because the "job description" upon which Berge relied in making that statement was, according to the testimony of hospital witnesses, not plaintiff's job description.  Moreover, in her deposition, Berge was provided the job description that hospital records show to be plaintiff's job description and, upon review, she confirmed that her test results indicated that plaintiff could not perform the duties described in that job description.  Finally, the "job description" upon which Berge relied in her letter was enclosed with the letter such that it was evident at the time what she had been using.

[6] Plaintiff asserts that Barrow's treatment notes indicate that she made some improvement after participating in therapy.  Defendant does not dispute that Barrow's notes indicate improvement.  However, defendant contends that this fact is not relevant to the case because of the dates of improvement and because there is no allegation or evidence that defendant was made aware of the treatment or alleged improvement at any time.

Plaintiff applied for four MUHA[7] jobs:

1.  Position# 9319000 - Clinical Nurse Coordinator in the psychiatric unit;
2.  Position# 012686 - Registered Nurse I in Oral and Maxiofacial Surgery;
3.  Position# A022846 - Program Manager I in Marketing Communications; and
4.  Position# A022187 - Administrative Assistant/Marketing Referral Call Center.

The parties agree that plaintiff was not qualified for the Psychiatric Unit position (#9319000), the surgical position (#012686), or the Program Manager position (# A022846). The only MUHA position that was available during the subject period for which plaintiff applied and for which she met the minimum qualifications, was the Call Center position (#A022187).

In addition to applying for the MUHA positions outlined above, plaintiff claims that she applied for two other positions, which she says she believed were MUHA positions:

1.  UMA Position in dermatology surgery
2.  Position in the McClennan Banks Center.

The parties agree that plaintiff was not qualified to perform the surgical position; therefore, only the McClennan Banks Center position was an option in this second category.

The only information contained in the record is that the McClennan Banks

---

[7]One of these MUHA positions– 012686– was actually an MUSC position, but for the purposes of this litigation, the parties have stipulated that the MUSC position shall be treated as an MUHA position. MUSC was initially a named defendant, and was subsequently dismissed by consent of the parties.

position was not an MUHA position and is thus irrelevant to plaintiff's claims.  As to the

Call Center position, the parties agree to the facts below.  The Call Center job was one

for which plaintiff appeared to have the minimum requirements.  It involved manning a

telephone station to receive calls from individuals in search of various types of health

care, then, depending upon the individual's need, referring that person's call to the

appropriate division of the Hospital for further assistance.  There were approximately 50

applicants.  The individual in charge of recruiting was Steve Paterniti ("Paterniti").

Because the job required telephone skills, Paterniti initially contacted the

applicants by telephone to get a sense of their phone skills.  During her telephone contact,

plaintiff did well, and Paterniti invited her in for a personal interview.  The parties agree

that plaintiff came in for an interview on August 8, 2002.  The parties also agree that

Paterniti created four records relating to the recruitment process: (1) notations on his

individual desk calendar of dates and times of interviews; (2) an Applicant Review List,

which he completed during the recruitment process; (3) a brief summary that the

Business Manager, as a matter of routine policy, required Paterniti to prepare relating to

the candidates, who was selected, and why; and (4) a letter to plaintiff dated August 16,

2002.  In addition to the documents created by Paterniti, the record includes a document

with handwritten notes made by Frisch, relating to the interviews with plaintiff.  Frisch

and Paterniti both testified that the handwritten notes were made by Frisch during a

telephone conversation with Paterniti about plaintiff's application.  Frisch testified that

he believed the handwritten notes to have been made on or about January 8, 2003– the

date that the computer printout on which they were written was printed.  Paterniti

testified that, at the time of the conversation, he was reading from his desk calendar to provide Frisch with the information handwritten by Frisch.  Paterniti also testified that he later discarded the calendar.  Ultimately, a candidate other than plaintiff was offered and accepted the Call Center position.

Plaintiff did not find another job, and the Hospital ended her employment at the end of the thirty-day period– July 14, 2002.[8]

**B.    Disputed facts (in the light most favorable to plaintiff)**

The parties dispute the extent to which plaintiff was provided with a reorientation into the Labor and Delivery unit once she was able to return to work.  Prior to what defendant terms the reorientation, plaintiff was placed to work in an exam room without any other RNs.[9]  Defendant did not provide plaintiff with what it terms the reorientation until May 15 or 16, two months after plaintiff returned to work.[10]  Defendant  presented two nurses who had purportedly "shadowed" plaintiff extensively during a reorientation.  One of those nurses, Althea Cooper-Smith ("Cooper-Smith"), testified that in actuality, she had only worked with plaintiff on one patient for one shift.  The other nurse, Stephenson, indicated that she had spent extensive time with plaintiff, but plaintiff argues

---

[8] Though plaintiff interviewed for the Call Center position in August, the thirty days that defendant gave her to find a new job ended in July; therefore, the formal date of plaintiff's termination was July 14, 2002.

[9] Defendant contends that plaintiff's assignment was in a "less hectic" area and that she had help close by at all times if she needed it.

[10] Defendant suggests that the reason it did not provide plaintiff with a reorientation until that time is because up until then she had been dealing with patients that required a lower acuity level.  Defendant further suggests that it was very soon after plaintiff began dealing with more demanding patients that Branson-Jones suggested the reorientation.

10

that a review of the call off sheet indicates otherwise.  Plaintiff claims that she was only working two shifts a week on her limited time and was being called out on average one of those days every week, making comprehensive shadowing impossible.[11]

The parties agree that plaintiff expressed her willingness to work and seemed sincere in her expression.  Plaintiff repeatedly points out that despite her expression and despite defendant's apparent perception of her as a person with a disability, neither Branson-Jones nor Frisch ever sat down with her and explained her rights under the Americans with Disabilities Act ("ADA").  Defendant argues that it was not required "or, technically, allowed" to counsel plaintiff on her legal rights under the ADA.  It reiterates that it complied with its responsibilities under the ADA and that disclosure of plaintiff's rights was not one of those responsibilities.

Plaintiff asserts that it was Branson-Jones and Frisch who decided to send her for testing.  Defendant adds that Dr. Khoury was also involved in this decision, as stated in the Joint Submission of Facts.  Plaintiff claims that the first testing performed was a Functional Capacity Evaluation ("FCE") and that in that FCE, it was determined that plaintiff could perform her duties as a Clinical Nurse II based on the job description that was provided by defendant.[12]

---

[11] Defendant explains this situation by stating that the shadowing was an extensive program in which multiple nurses worked to shadow plaintiff all of the time (except her initial stint in the exam room), i.e., it did not involve just two nurses. Additionally, defendant asserts that the days that plaintiff got "called off" were by her own choice.

[12] Defendant points out that the Occupational Therapist's evaluation occurred first and that the subsequent FCE occurred as a result of Dr. Khoury's recommendation, not as a result of any decision by defendant.  Additionally, as noted in the previous section,

11

Both Frisch and Branson-Jones instructed plaintiff to go to Lynn Campbell ("Campbell"), a nurse recruiter, to apply for other jobs at MUHA and MUSC and that if plaintiff did not find a job within 30 days, she would be terminated. Plaintiff alleges that Frisch offered no further assistance to her in getting her reassigned or transferred to another position, nor did he offer her any further assistance in accommodating her disabilities. Pursuant to defendant's instructions, plaintiff went to Campbell and was given a listing of the MUSC postings, but no other assistance was offered.[13]

MUHA is one of the largest employers in the State of South Carolina. According to Frisch, MUHA employs over 5,000 men and women. During the 30 days prior to July 14, 2002, the date of plaintiff's termination, defendant's Career Opportunities Announcement was updated on a weekly basis. During this time, at the highest, there were 280 listed vacant positions, and at the lowest, there were 246 listed vacant positions, including but not limited to various Administrative, Management, Clerical, Nursing, and Nursing Assistant positions. Even though plaintiff did not qualify for all of the positions, she submits that there were numerous positions that she was able to perform. Furthermore, plaintiff alleges that defendant failed to assist her in obtaining a new position.[14]

---

defendant disputes that the job description under which Berge found plaintiff able to work was an accurate or official description of plaintiff's job, claiming that it "has no way of knowing how Ms. Berge came to possess that document."

[13] Defendant alleges that plaintiff never met with Campbell like she was instructed to do, but instead only went by her office and picked up a list of job openings from which she picked six positions to apply for.

[14] Defendant responds that it had no duty to place plaintiff in a position that she was not interested in taking, i.e., because she only applied for some of the available

One of the jobs in question was at the MUSC call center. Defendant asserts that plaintiff failed to show up for her second interview for this position and that is why she was not hired. Defendant offered some notes written by Frisch on a print out log for that job as evidence of plaintiff's failure to show up for her second interview. Plaintiff submits that the notes conflict with deposition testimony. The interviewer at the call center, Paterniti, indicated in his deposition that the director of the department, Hope Colyer ("Colyer"), only engaged in final interviews. He also indicated that he kept a calendar showing a second scheduled appointment and that when plaintiff filed her complaint, he was contacted about the contents of the calendar. Paterniti testified that the calendar showed a second interview scheduled for plaintiff on August 16, 2002. Plaintiff asserts that Frisch's notes show otherwise. Specifically, plaintiff contends that Frisch's notes show plaintiff's interview with Colyer had already taken place, before the alleged second interview. Paterniti has since disposed of the calendar.

Plaintiff indicates that she underwent a second interview for the position.[15] She maintained her appointments on her personal calendar, which shows that the interview that took place on August 8, 2002 included interviews with both Colyer and Paterniti. There was no appointment on plaintiff's calendar for August 16. Additionally, plaintiff

positions, defendant reasonably assumed she was not interested in the others.

[15] Defendant argues that plaintiff has changed her story on this issue several times and asserts that she cannot create a genuine issue of material fact simply by submitting different versions of her own story. Defendant states that plaintiff testified that she attended a second interview on August 16, 2002 but then denied that there was a second interview scheduled for that day in her responses to its requests to admit. Defendant further points out that plaintiff then denied that she failed to appear for the August 16, 2002 interview.

ultimately received a letter dated August 16, 2002, the same date she allegedly missed the

appointment, informing her that someone else had been chosen for the position.  The

letter said nothing about a missed appointment.  Plaintiff asserts that the person that was

hired that day was hired first thing in the morning and was an external applicant, while

plaintiff was a qualifying internal applicant with a disability.  None of the "finalists" for

the position was an internal applicant.[16]

Plaintiff also received an evaluation by a vocational expert, Hutchinson, who

testified that plaintiff was able to perform jobs that involve finite and routine tasks in the

RN field, including, but not limited to:

> discharge planning and intake, many of those require filling
> out numerous forms.  It is a routine task because on every
> patient you do Form A,B,C,D and you are– it's not
> anything that has to go at any kind of rapid pace.  A lot of it
> depends on the level of the patient you're dealing with.
> Those would be routine tasks, those would be finite
> because there is a set group of documents that need to be
> completed at certain points doing say hospitalization,
> preauthorization and planning or discharge planning if
> someone is coming out of the hospital.  And her nursing
> background would give her the ability to answer questions
> and I think cognitively and physically she would be able to
> perform the task.

In addition, Hutchinson testified that plaintiff could continue to work in a hospital setting

as a nurse, including administrative type nursing positions and limited direct patient care

positions, such as taking vital signs and administering medications.

---

[16] Defendant counters that there is no evidence in the record to suggest what time
the person who received the call center job was hired and no evidence of any MUHA
policy preference for internal applicants.

## IV.  Analysis

The magistrate judge recommended granting defendant summary judgment on the state causes of action and denying defendant summary judgment on the remaining federal causes of action.  Plaintiff did not object to the former recommendation; defendant objects to the latter.  The court addresses each in turn.

### A.    Plaintiff's discrimination and retaliation claims under state law

As stated above, the magistrate judge recommended that defendant be granted summary judgment on all of plaintiff's state law causes of action.  Plaintiff did not object to this recommendation; therefore, the court is not obligated to review it.  As such, for the reasons stated in the magistrate judge's Report, summary judgment will be granted to defendant on all of plaintiff's state law causes of action.

### B.    Plaintiff's federal law claims

There are generally two issues for discussion under plaintiff's federal claim of discrimination: (1) whether plaintiff has sufficiently explained the inconsistent positions she has taken with the Social Security Administration and this lawsuit and (2) whether plaintiff has otherwise shown a genuine issue of material fact as to her ADA case.  The court takes each in turn.

#### i.    Inconsistent positions

On February 10, 2005, plaintiff filed an application for Social Security Disability Insurance ("SSDI") benefits for a purported disability commencing on September 18, 2001 (the date of her initial stroke) and continuing up to the time of the application.  In her application, plaintiff claimed, under oath, that she "became unable to work because of

[her] disabling condition on September 18, 2001."

The ADA only prohibits discrimination against a "qualified individual with a disability," 42 U.S.C. § 12112(a), and defines such a person as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions" of her job.  42 U.S.C. § 12111(8).  See Fox v. GMC, 247 F.3d 169, 177 (4th Cir. 2001).  Defendant argues that plaintiff's assertion that she could not work as of September 18, 2001 shows that she could not perform the essential functions of her job as of the date she was fired and hence was not a qualified individual within the meaning of the ADA.  Plaintiff contends that her two positions are not impermissibly inconsistent according to controlling law.  The magistrate judge did not address this issue in his Report; therefore, it is ripe for an initial determination.

In Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795 (1999), the Supreme Court was faced with a similar factual scenario as the one before this court, namely whether a plaintiff was allowed to take differing positions when applying for SSDI benefits and bringing a suit under the ADA.  After recognizing that a claim to the Social Security Administration that one was unable to work could be at odds with the prerequisite to suit under the ADA that a plaintiff had to be able to fulfill the essential functions of one's job, the Court refused to hold that the two theories were always at odds.  Id. at 802-03.  Among the reasons for its decision, the Court noted that "an ADA suit claiming that the plaintiff can perform her job with reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) without it."  Id. at 803.  As another example, the Court recognized that "if

16

an individual has merely applied for, but has not been awarded, SSDI benefits, any

inconsistency in the theory of the claims is of the sort normally tolerated by our legal

system," id. at 805, seemingly wanting to mark a safe channel between a proverbial

Scylla and Charybdis.[17]

      Relying on the above observations to refuse to apply a special legal presumption,

the Court did not leave plaintiffs completely burden-free.

> An ADA plaintiff bears the burden of proving that she is a
> "qualified individual with a disability" . . . .  And a
> plaintiff's sworn assertion in an application for disability
> benefits that she is, for example, "unable to work" will
> appear to negate an essential element of her ADA case– at
> least if she does not offer a sufficient explanation.  For that
> reason, we hold that an ADA plaintiff cannot simply ignore
> the apparent contradiction that arises out of the earlier SSDI
> total disability claim.  Rather, she must proffer a sufficient
> explanation.

Id. at 806.  The Court expanded on this requirement by comparing the inconsistency to

cases where a plaintiff takes opposing views in discovery materials and explained:

---

[17] In Homer's Odyssey, the cunning Greek warrior, Odysseus, and his men had to
overcome reportedly insurmountable obstacles in order to make it to the safe harbors of
their home.  Scylla was a multi-headed female monster, personifying a dangerous rock on
the Italian side of the Straits of Messina; Charybdis was a creature whose daily
consumption of the sea created a whirlpool off the Northeastern coast of Sicily.  Because
these creatures lived on opposite shores of a narrow strait, it was supposedly impossible
to navigate away from one peril without falling prey to the other.  Here, the Court
recognized potential plaintiffs' predicament of not being able to sail too close to Scylla
by claiming they could work (for fear of foreclosing their rights to SSDI benefits) while
still avoiding Charybdis by arguing that they could work with reasonable accommodation
(hence keeping their ADA claims alive).  The law attempts to minimize dangerously
narrow passages where appropriate but nonetheless creates them from time-to-time.  See
Harmon v. Apfel, 103 F. Supp. 2d 869, 872 n.2 (D.S.C. 2000).

> When faced with a plaintiff's previous sworn statement
> asserting "total disability" or the like, the court should
> require an explanation of any apparent inconsistency with
> the necessary elements of an ADA claim.  To defeat
> summary judgment, that explanation must be sufficient to
> warrant a reasonable juror's concluding that, assuming the
> truth of, or the plaintiff's good faith belief in, the earlier
> statement, the plaintiff could nonetheless "perform the
> essential functions" of her job, with or without "reasonable
> accommodation."

Id. at 807.

The Fourth Circuit has had two occasions to interpret this holding, and this court

has weighed in on at least one occasion.  In EEOC v. Stowe-Pharr Mills, Inc., 216 F.3d

373 (4th Cir. 2000), the plaintiff had taken the type of inconsistent positions discussed

above, and the Fourth Circuit undertook to review her explanation of the inconsistency:

> according to her affidavit, [plaintiff] told the SSA intake
> officer that she could work with reasonable
> accommodation.  However, in applying for SSDI benefits,
> [plaintiff] was not required to "refer to the possibility of
> reasonable accommodation."  The intake officer thus
> advised her to state on her application that she was unable
> to work due to her disability.  She followed the intake
> officer's advice.  It follows . . . that the routine language
> [plaintiff] used on her SSDI application in January 1995– "I
> [am] unable to work because of my disabling condition"–
> did not take into account whether she could have worked
> with reasonable accommodation.  This explanation is
> sufficient for a reasonable juror to conclude that
> [plaintiff's] SSDI statement does not contradict her
> assertion in this (the ADA) case that she could have worked
> if [defendant] had accommodated her . . .  Accordingly,
> [plaintiff's] statement in her SSDI application does not
> preclude [her] from establishing a triable question on the
> "qualified individual" element of the ADA claim . . . .

Id. at 379.  Likewise, in Fox v. GMC, 247 F.3d 169 (4th Cir. 2001), the plaintiff had

applied for total disability workers' compensation benefits and filed suit under the ADA.

18

Id. at 177.  The Fourth Circuit reviewed his explanations for the inconsistency and found

them both sufficient.  Id. at 178.

> First, as [plaintiff] notes, his two claims do not overlap
> temporally. . . . Thus, application for and receipt of
> workers' compensation benefits for total temporary
> disability for the period after mid-August 1995 does not
> preclude the damages Fox seeks under the ADA for the
> harassment that he experienced prior to midAugust [sic]
> 1995.
>     Furthermore, as [plaintiff] also points out, he
> produced evidence that he could have, and would have,
> continued to work (with reasonable accommodation) [for
> defendant] in August 1995 but for the hostile work
> environment to which he was subjected at the plant. . . .
>     In sum, [plaintiff] has proffered a "sufficient
> explanation for any apparent contradiction" between his
> ADA and workers' compensation claims.

Id.

    In Taliaferro v. Assocs. Corp. of N. Am., 112 F. Supp. 2d 483 (D.S.C. 1999),

Judge Duffy reviewed a case in which the plaintiff had been granted SSDI benefits and

filed suit under the ADA.  Finding that plaintiff had simply failed to explain the

inconsistency, the court relied on Cleveland to grant defendant summary judgment on the

ADA claim:

> [Plaintiff] fails to rebut the inconsistency of his earlier
> assertion that he is "totally disabled" in the face of his
> present claim that he was capable of performing his job
> with reasonable accommodations.  Without some factual
> explanation to render the two positions consistent,
> [plaintiff] cannot establish any material issue of fact with
> regard to that element of the ADA.  Therefore, [plaintiff]
> fails to establish that he was a qualified individual.

Id. at 491.

19

In the present case, plaintiff informed defendant of her second application[18] for SSDI benefits approximately one week before the summary judgment hearing in front of the magistrate judge, and defendant raised the <u>Cleveland</u> issue, i.e., that plaintiff needed to offer an explanation for her inconsistent positions, in a Supplemental Brief to the court. The day of the hearing, plaintiff submitted her own Supplemental Brief, which merely stated:

> The pursuit and receipt of Social Security Disability Insurance (SSDI) benefits under 42 U.S.C.S. § 423(d)(2)(A) does not automatically estop the recipient from pursuing a claim under the Americans with Disabilities Act of 1990 (ADA), seeking reasonable accommodation pursuant to 42 U.S.C.S. § 12111(8). Nor does the law erect a strong presumption against the recipient's success under the ADA.

(Pl.'s Supp. Brief at 2.) At the hearing, plaintiff further explained that she had submitted the pertinent language ("I am unable to work") after the Social Security Administration denied her initial application and in response to a request on her application for reconsideration that she state additional reasons why she qualified for SSDI. When pressed by the magistrate judge as to whether that was plaintiff's explanation, plaintiff's counsel responded that:

> the problem we have is she applied so late in this situation, deposition was taken long ago, discovery was closed out, you know, sometime probably before she even filed this

---

[18] Plaintiff filed a previous application for SSDI on October 12, 2001 but did not claim disability for the time period that includes her ADA claim; therefore, the first application was not necessarily inconsistent with her current lawsuit. In other words, plaintiff's first application claimed that she was disabled while she was bedridden after her stroke but did not claim that she was disabled 10 months later when she claims to have been discriminated against under the ADA.

> application.  So you know, I don't know if we would need
> to flesh that out more and do additional discovery on that.
> We just don't have that information.

(Trans. at 22.)  Counsel continued:

> So if we don't have the information, then you go back to
> the Cleveland case that basically says just because
> somebody has applied, and even if they qualified, doesn't
> mean that you automatically go in and say, you know, they
> can't . . . And I guess if that's going to be the cornerstone
> of your ruling, I'd just ask Your Honor to maybe reopen the
> deposition or something so we can get that information.

(Trans. at 22-23.)

Had the matter ended here, plaintiff would have been in treacherous waters.  At

the August 2 hearing, however, plaintiff explained that she had thought it improper to

submit evidence after the close of discovery.  This court granted plaintiff one week to

submit an explanation of her seemingly inconsistent statements.  On August 8, 2005,

plaintiff submitted an affidavit explaining:

> In February 05, I was contacted by Social Security and they
> told me I needed to reapply for benefits or they were
> closing my file.  I filed.
>        I told the examiner that I could work if I had
> appropriate accommodation, but she said that I had to put
> down that I was unable to work.  The examiner said that
> there was no block for that option.  She also said that there
> was no way to put that I could work, just not at my old
> level.  Although I explained all of that to the examiner, she
> told me there was only one option, to put down "unable to
> work."

(Pl.'s Aff. at ¶¶ 2-3.)  Plaintiff's affidavit brings her case squarely in line with

Stowe-Pharr Mills in that she explained to the Social Security Administration that she

could work with reasonable accommodation but was instructed that she could not take

that position in her SSDI application.  Additionally, plaintiff's affidavit shows that she

was rejected for SSDI benefits, further aligning her case with the rationale in <u>Cleveland</u>

for allowing alternate arguments.[19]  As plaintiff has sufficiently explained her two

positions, they do not form an adequate basis for granting defendant summary judgment;

therefore, the court will continue to the substance of defendant's second set of objections

to the magistrate judge's Report.

### ii.     Remaining issues under the ADA

Defendant makes three basic objections to the magistrate judge's recommendation

that plaintiff's federal retaliation claim should be allowed to proceed to trial.  First,

defendant argues that plaintiff's retaliation claim is simply a recasting of her

discrimination claim and hence improperly duplicative.  Second, defendant argues that

the magistrate judge incorrectly concluded that plaintiff had presented a prima facie case

for retaliation.  Third, defendant argues that the magistrate judge did not properly apply

the burden-shifting test to plaintiff's retaliation claim.  Defendant also makes one basic

objection to the magistrate judge's recommendation regarding plaintiff's discrimination

claim: it argues that plaintiff has failed to raise a genuine issue as to the material fact that

it was willing to place plaintiff in another position had she not failed to complete the

interview process.[20]  The court addresses these two sets of concerns in reverse order, i.e.,

---

[19] The court instructed defendant that it would be allowed to depose plaintiff on this narrow issue if it so chose– and that allowance stands– but having not yet heard from defendant, the court has issued this order to ensure that the case proceeds in a timely manner.

[20] Defendant also asks the court to make several rulings in order to "narrow and more clearly define the issues for trial."  The court makes only those determinations

the discrimination claim first, then the retaliation claim.

### 1.    Discrimination under the ADA

Plaintiff's complaint alleges a claim for failure to accommodate rather than one for wrongful discharge.[21]  In order to make out a prima facie case for failure to accommodate, plaintiff must show (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.  Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001).  For the purposes of this section, defendant does not dispute the first three elements of plaintiff's case.[22]  As such, the question is whether plaintiff can show a genuine issue of material fact regarding defendant's refusal to make reasonable accommodation.

Since plaintiff has established that she is disabled under the statute, defendant, as

_____

necessary for disposition of the motion before it and reserves all other rulings until such time as they become ripe.

[21] In order to make out a wrongful discharge case under the ADA, the Fourth Circuit has instructed that a plaintiff must demonstrate that (1) she is within the ADA's protected class; (2) she was discharged; (3) at the time of her discharge, she was performing the job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.  Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001).  Whether it is because plaintiff agrees with defendant that she cannot meet element three or whether it be for some other reason, plaintiff conceded at the hearing before the magistrate judge that her claim is one for failure to accommodate.  (Maj. J. trans. at 23-24.)

[22] Defendant reserves its former argument that plaintiff is not a qualified individual (the third element) because she made a sworn statement that she could not perform the essential functions of her position with reasonable accommodation, but the court has rejected that argument above in Section IV(B)(i).

23

her employer, must make "reasonable accommodations" unless it can demonstrate that the accommodation "would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).  Defendant has not argued undue hardship, so the question hinges on defendant's obligation to make only those accommodations that are "reasonable."  EEOC v. Sara Lee Corp., 237 F.3d 349, 353 (4th Cir. 2001).  The ADA itself says that the term "'reasonable accommodation' may include . . . reassignment to a vacant position."  42 U.S.C. § 12111(9)(B); see also US Airways, Inc. v. Barnett, 535 U.S. 391, 396 (2002) (recognizing the same).

Defendant argues (1) that it engaged plaintiff in an interactive process to find her a suitable reassignment, (2) that she chose the open positions that she was interested in, and (3) that she then withdrew from the process by failing to follow through with the entire interview process on the one job that she was qualified to perform of the list that interested her, thus relieving defendant of any further burden of accommodation. Plaintiff responds (1) that defendant did not engage her in an adequate interactive process but instead referred her to a cumbersome list of hundreds of jobs and (2) that she did everything that was asked of her regarding the position defendant admitted she was qualified to perform.

The court finds (1) that it need not decide whether defendant engaged plaintiff in a sufficient interactive process to satisfy the mandates of the ADA and (2) that the evidence in this case will not allow defendant to argue that it hired someone based on

unequal qualifications of the applicants.[23]  Plaintiff received a list of job openings from defendant, to that much the parties agree.  Additionally, the parties agree that plaintiff applied for several of those jobs and was qualified for one of them.  As such, the real issue is whether plaintiff withdrew herself from consideration for the Call Center position, i.e., the reasonable accommodation, or whether defendant failed to offer plaintiff the reasonable accommodation.  The court finds, as did the magistrate judge, that there is a genuine issue of material fact as to which party ended the quest for the reasonable accommodation.

Defendant admits that plaintiff was qualified for the position on paper, passed the initial telephone interview, and was still a candidate after her first live interview. Defendant then alleges that plaintiff failed to attend her second scheduled interview and was thus dropped from consideration.  Defendant argues that its evidence to support these assertions is undisputed save plaintiff's internally inconsistent statements, which it argues are insufficient for plaintiff to survive summary judgment.  Plaintiff claims that she did attend a second interview and that, consequently, defendant's excuse for not giving her the position is pretextual and amounts to refusing her reasonable accommodation.

---

[23] Though at times it is unclear whether defendant is arguing that plaintiff was not as qualified as the person who obtained the Call Center job, it is clear that the evidence defendant relies on does not support that argument.  Defendant's only supportable position is that it did not hire plaintiff because she failed to show for a follow-up interview.  For that reason, this case is not about seniority systems or even about whether hiring someone that is more qualified for a position is analogous to following a seniority system.  See US Airways, Inc. v. Barnett, 535 U.S. 391, 406 (2002).  Instead, this case is about whether plaintiff or defendant was responsible for ending the interactive search for a reasonable accommodation.  For that reason, to the extent defendant argues the relevancy of the qualifications of the respective applicants, that argument is rejected.

The court finds that plaintiff's statements are not sufficiently inconsistent to prevent her from surviving summary judgment. Plaintiff initially claimed, in her deposition, that she attended a second interview on August 16, 2002. Subsequent to her deposition, production of her own calendar showed that she was elsewhere on that date, but plaintiff still maintains that she attended a second interview. Paterniti, the interviewer, testified that the second interview was originally scheduled for some date between the first interview and August 16, 2002, but that the date was changed to August 16 at plaintiff's request. There is also evidence in the record (from defendant and plaintiff) that plaintiff interviewed with Colyer and that Colyer only attends secondary interviews. Additionally, defendant mailed plaintiff the letter informing her that it had hired someone else on August 16, 2002, the day that it claimed plaintiff was supposed to come in for her second interview. In short, a jury could reasonably find from the evidence that plaintiff did show up for the second interview, that defendant thus denied her the call center position for a reason other than the one it gave, and that defendant cannot therefore claim that the offer of the position was a reasonable accommodation. For that reason and for those stated my the magistrate judge at the hearing, in his Report, and by this court at the subsequent hearing, defendant's motion for summary judgment on this issue will be denied.

## 2.      Retaliation under the ADA

Defendant next argues that plaintiff's retaliation claim should fail as a rehash of her discrimination claim. The court agrees. To establish a prima facie case of retaliation under the ADA, plaintiff must show (1) that she engaged in protected activity; (2) that

defendant took adverse action against her; and (3) that there existed a causal connection between the protected activity and the adverse action.  Rhoads v. FDIC, 257 F.3d 373, 392 (4th Cir. 2001).  Requesting accommodation is a protected activity under the ADA.  See Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 706 (4th Cir. 2001).  Plaintiff's complaint alleges that defendant "refused to accommodate her position, thereby terminating Plaintiff's position, causing her to lose her wages, benefits, including but not limited to health benefits, in retaliation for her medical disability."  (Compl. at 5.)  In her response to defendant's motion for summary judgment, plaintiff states:

> the retaliation began with [sic] Plaintiff returned to work following her injury and had requested accommodations. She asked for help tying her mask, tying tourniquets, and starting IVs.  Once she made those requests, Defendant set about a process designed not to help her with her disabilities, but to set her up for termination.  Throughout this case, it has been admitted that the Plaintiff was terminated due to her disabilities.

(Pl.'s Resp. at 21.)  Again at the hearing before this court, when asked about plaintiff's retaliation claim, her counsel responded, "we have a retaliation claim because she asked for accommodations and they weren't given."  (Trans. at 8.)

Plaintiff's requests for help tying her mask, help tying tourniquets, and help with IVs are requests for reasonable accommodation and are protected activity under the ADA.  Plaintiff was terminated, which is an adverse action under the ADA.  But, plaintiff has failed to show a causal connection between the protected activity and the adverse action she suffered.  Plaintiff has presented no evidence that defendant fired her because it did not want other nurses assisting her with mask-tying and IV-connecting.  Instead, plaintiff either states generally that she was fired in retaliation for requesting

27

accommodation or argues in the abstract that she was fired because of her disability.  The former is insufficient at summary judgment and the latter relates to her claim of discrimination.  Additionally, though plaintiff has not articulated any request for reassignment as one of her protected activities, to the extent that she intends it, she has presented no evidence that defendant fired her because she requested reassignment, only that she was denied reassignment because of her disability.  This distinction is the one that separates a discrimination claim from a retaliation claim.  As plaintiff has not established a prima facie claim of retaliation, the court need not reach the other elements of the burden-shifting analysis.

## V.    Conclusion

It is therefore, **ORDERED**, for the foregoing reasons, that defendant's motion for summary judgment with regard to all of plaintiff's state law claims and with regard to plaintiff's federal retaliation claim is **GRANTED**.  It is further **ORDERED** that defendant's motion for summary judgment with regard to plaintiff's federal claim for failure to accommodate is **DENIED**.

**AND IT IS SO ORDERED**.

**David C. Norton**
**United States District Judge**

**August 26, 2005**
**Charleston, South Carolina**